IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE CONSTITUTION PARTY OF | : | |
| PENNSYLVANIA, et. al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | 12-CV-2726 |
| PEDRO CORTES, et. al. | : | |
| | : | |
| Defendants. | : | |

MEMORANDUM

Stengel, J.                                                    July 23, 2015

This is an action brought by three political parties to challenge a portion of

Pennsylvania's Election Code. The Constitution Party of Pennsylvania (CPPA), the

Libertarian Party of Pennsylvania (LPPA), the Green Party of Pennsylvania (GPPA), and

several party leaders[1] contend that the Commonwealth's ballot access rules violate the

First and Fourteenth Amendments to the United States Constitution. Specifically,

plaintiffs attack 25 P.S. § 2911(b)[2] and 25 P.S. § 2937[3] which, in combination, force a

---

[1] In addition to the three minor parties, plaintiffs include Joe Murphy, chairman of the CPPA; Carl Romanelli, chairman of the GPPA; Thomas Robert Stevens, chairman of the LPPA; James Clymer, a member of the CPPA; and Ken Krawchuk, a former candidate of the LPPA.

[2] The statute provides in relevant part: "Where the nomination is for any office to be filled by the electors of the State at large, the number of qualified electors of the State signing such nomination paper shall be at least equal to two per centum of the largest entire vote cast for any elected candidate in the State at large at the last preceding election at which State-wide candidates were voted for…." 25 P.S. § 2911(b).

[3] The statute provides in relevant part: "All nomination petitions and papers received and filed within the periods limited by this act shall be deemed to be valid, unless, within seven days after the last day for filing said nomination petition or paper, a petition is presented to the court specifically setting forth the objections thereto, and praying that the said petition or paper be set aside.… Upon the presentation of such a petition, the court shall make an order fixing a time for hearing which shall not be later than ten days after the last day for filing said nomination petition or paper, and specifying the time and manner of notice that shall be given to the candidate or candidates named in the nomination petition or paper sought to be set aside. On the day fixed for said hearing, the court shall proceed without delay to hear said objections, and shall give such hearing precedence over other business before it, and shall finally determine said matter not later than fifteen (15) days after the last day for filing said nomination petitions or papers. If the court shall find that said nomination petition or paper is defective under the provisions of [25 P.S. § 2936] or does not contain a sufficient number of genuine signatures of electors entitled to sign the same under the

minority party to assume the risk of incurring substantial financial burdens to defend nomination papers they are required by law to submit. Plaintiffs assert both as-applied and facial challenges against the Election Code. The defendants are Pedro Cortes, the Secretary of the Commonwealth, and Jonathan Marks, the Commissioner of the Bureau of Commissions, Elections, and Legislation.[4] The plaintiffs and the defendants have filed cross motions for summary judgment. For the reasons that follow, I find that the statutes are unconstitutional as applied to the plaintiffs but they are facially valid.

## I      Background

To place the plaintiffs' allegations in context, I will first discuss the relevant provisions of the Pennsylvania Election Code.

### a)      The Pennsylvania Election Code

The Pennsylvania Election Code distinguishes political parties from political bodies. 25 P.S. § 2831(a). A political party is one whose candidates "polled a total vote in the State equal to at least two per centum of the largest entire vote cast in the State for any elected candidate" in the preceding general election.[5] Id. Political bodies are those groups which do not cross the 2% threshold. §2381(c). The Election Code further classifies political parties as either major or minor parties. Constitution Party of Pennsylvania v. Aichele, 757 F.3d 347, 350-51 (3d Cir. 2014) (citing §2872.2(a)). A

---

provisions of this act, or was not filed by persons entitled to file the same, it shall be set aside…. In case any such petition is dismissed, the court shall make such order as to the payment of the costs of the proceedings, including witness fees, as it shall deem just…."25 P.S. § 2937.

[4] This case was originally filed against Secretary of the Commonwealth Carol Aichele. On June 2, 2015, the Pennsylvania Senate confirmed Pedro Cortes as the Secretary of the Commonwealth. Thus, Mr. Cortes is substituted for Ms. Aichele as the real party in interest. Attorney General Kathleen Kane was also a defendant, but the Third Circuit dismissed all claims against her because she "does not have a discrete role in administering the Pennsylvania Election Code." Constitution Party of Pennsylvania v. Aichele, 757 F.3d 347, 350 n. 3 (3d Cir. 2014).

[5] Political parties must also cross the 2% threshold in at least 10 counties. §2381(a).

minor party is "a political party whose state-wide registration is less than fifteen per centum of the combined state-wide registration for all state-wide political parties…." §2872.2(a). The major parties[6] are those whose membership exceeds 15% of all registered voters. <u>Aichele</u>, 757 F.3d at 350-51. "At present, there are only two major parties in Pennsylvania, the Democratic Party and the Republican Party, as has been the case since the election code was enacted more than three-quarters of a century ago." <u>Id</u>. at 351.

Neither the CPPA, LPPA nor GPPA fielded candidates in the 2014 general election and are currently classified as political bodies. Pls.' Statement of Undisputed facts, doc. no. 60-2, ¶ 40. In earlier years, plaintiffs have qualified as minor political parties. Pls.' Statement of Undisputed Facts ¶¶ 1-3.[7] "Ultimately, the distinction between minor parties and political bodies is of less consequence in this case than is the distinction between major parties and non-major parties, since all non-major parties face essentially the same fight to get their candidates on the ballot through the submission of nominating papers." <u>Constitution Party of Pennsylvania v. Aichele</u>, 757 F.3d 347, 351 (3d Cir. 2014). Despite the plaintiffs' current classification, I will, at times, refer to the plaintiffs as the minor parties.

The major political parties place their candidates on the general election ballot by way of publicly funded primary elections. §2862. To access the primary election ballot,

---

[6] The Pennsylvania Election Code does not use the term major party. Rather, there are only minor political parties and non-minor political parties. I will use the term major party, as employed by the Third Circuit, for ease of reference.

[7] Defendants agree that plaintiffs each qualified as minor parties during prior elections. Defendants and plaintiffs dispute in what years plaintiffs qualified as minor parties. This dispute is immaterial. It is enough that the both sides agree that plaintiffs at one time or another qualified as minor parties.

major party candidates for President, United States Senator and Governor[8] must submit nomination petitions containing at least 2,000 valid signatures of registered members of their party. §2872.1. Major party candidates for Pennsylvania Treasurer, Auditor General and Attorney General must obtain 1,000 valid signatures.[9] Id. Major party candidates for statewide office circulate nomination petitions for three weeks ending on the tenth Tuesday prior to the primary election when they must file the petitions with the Secretary of the Commonwealth. §§ 2868, 2873(c). "The winner of the plurality of votes in the primary is placed on the general election ballot as the candidate of his or her respective party." Rogers v. Corbett, 468 F.3d 188, 191 (3d Cir. 2006).

   Minor party, political body and independent candidates do not run in primary elections. §2872.2; §2911. Instead, they must circulate nomination papers in order to place their names on the general election ballot. §2911(b). For statewide candidates,[10] the number of valid signatures required must exceed 2% of the "largest entire vote cast for any elected candidate in the State at large at the last preceding election at which State-wide candidates were voted for." § 2911(b). In recent years, the minimum signature requirement has been 25,697 in 2004; 67,070 in 2006; 24,666 in 2008; 19,056 in 2010; 20,601 in 2012; and 16,639 in 2014. Pls.' Statement of Undisputed Facts ¶ 10. Candidates have approximately five months to circulate nomination papers which must be filed on or before August 1. §2913(b); Rogers, 468 F.3d at 191; Dfs.' Statement of

---

[8] A gubernatorial candidate's petition must include 100 signatures from each of at least ten counties. §2872.1

[9] These petitions must include 100 signatures from each of at least five counties. §2872.1

[10] In congressional and state legislative races, "the number of qualified electors of the electoral district signing such nomination papers shall be at least equal to two per centum of the largest entire vote cast for any officer, except a judge of a court of record, elected at the last preceding election in said electoral district…." § 2911(b). Plaintiffs' complaint focuses on their efforts to place statewide candidates on the general election ballot. Therefore, I will not discuss the different regulations applicable to non-statewide candidates.

Undisputed Facts, doc. no. 59-2, ¶ 14.[11] The 2% signature requirement was enacted in 1971,[12] Aichele, 757 F.3d at 353 (internal citations omitted), and does not violate plaintiffs' associational rights or their rights to equal protection of the law. Rogers, 468 F.3d at 197 – 98.

The Secretary must examine both the nomination petitions filed by major party candidates and the nomination papers[13] filed by non-major party candidates and reject those petitions and papers which contain material errors, material alterations, or an insufficient number of signatures. § 2936. Although permitted to do so, id., the Secretary and his staff do not review the validity of signatures appearing on the nomination petitions and papers. Defs.' Statement of Undisputed Facts ¶ 18. The verification of signatures is left to private parties who, within seven days of the filing deadline, may object to the validity of a candidate's signatures and petition[14] the Commonwealth Court to set aside the nomination petition or paper. §2937; In re Nader, 905 A.2d 450, 459 (Pa. 2006) ("Commonwealth Court has original exclusive jurisdiction of matters relating to statewide office."). The Commonwealth Court must set aside the nomination petition or paper if it finds:

---

[11] Although §2913(c) requires minor party candidates to file nomination papers on or before the second Friday subsequent to the primary, the state moved the filing deadline to August 1 pursuant to two consent decrees entered in Hall v. Davis, 84-cv-1057 (E.D. Pa.) and Libertarian Party of Pennsylvania v. Davis, 84-cv-0262 (M.D. Pa.).

[12] The 1971 amendment to the Election Code quadrupled the signature requirement. People's Party v. Tucker, 347 F. Supp. 1, 2 (M.D. Pa. 1972).

[13] Nomination petitions and nomination papers are terms of art under the election code. Major party candidates file nomination petitions. All other candidates file nomination papers. "Although the terms are sometimes used interchangeably, … [I] will adhere to the statutory distinction as much as possible." Aichele, 757 F.3d at 352 n. 5.

[14] Section 2937's use of the term petition to define the device by which parties may object to nomination petitions and papers is imprecise and confusing leading to disagreement among the justices of the Pennsylvania Supreme Court about the interpretation of the statute. Compare In re Nader, 905 A.2d 450, 458 (2006) with Id. at 461 (Saylor, J., dissenting) (disagreeing about the meaning of "in case any such petition is dismissed").

that said nomination petition or paper is defective under the provisions of [§2936] or does not contain a sufficient number of genuine signatures of electors entitled to sign the same under the provisions of this act, or was not filed by persons entitled to file the same….

§ 2937. "[A] member of an opposing party [or an unaffiliated elector] does not have standing to challenge the nomination petition of a candidate in another party's primary election." In re Williams, 625 A.2d 1279, 1281 (Pa. Cmwlth. 1993). On the other hand, any registered voter in the Commonwealth, regardless of party affiliation, may challenge the nomination paper of a non-major party candidate seeking a place on the general election ballot. *Cf*. In re Barlip, 428 A.2d 1058, 1060 (Pa. Cmwlth. 1981) ("[I]t is clear that any person who is registered to vote in a particular election has a substantial interest in obtaining compliance with the election laws by any candidate for whom that elector may vote in that election, and such electors therefore have standing to challenge the nominating petitions of those candidates.")

Pennsylvania is the only state which venues petition verification in the judiciary. Pls.' Statement of Undisputed Facts ¶ 13. Other states shoulder the costs of petition verification, and the task is conducted by the employees of an executive branch agency. Id. The process is quite different in Pennsylvania. At the beginning of each challenge proceeding, the Commonwealth Court issues its standing order instructing both the candidate and objector to provide workers to review the signatures on the challenged nomination paper. Pls.' Statement of Undisputed facts ¶ 13. The workers compare the information on the nomination paper with the information recorded in the Statewide

Uniform Registry of Electors ("SURE") system.[15] Defs.' Statement of Undisputed Facts ¶ 22. Based on this review, the candidates and objectors stipulate to the validity or invalidity of as many signatures possible. Order at ¶ 5, In Re: Nomination Paper of Virgil H. Goode, No. 508 M.D. 2012 (Pa. Commw. August 10, 2012), doc. no. 60-1, p. 8-11. The Court then reviews the signatures that remain in dispute and ultimately determines whether the candidate should be placed on the ballot. Defs.' Statement of Undisputed Facts ¶ 26. The Commonwealth Court's procedure for signature verification is an exercise of its inherent powers. The procedures are not mandated by the Election Code. Id. ¶ 24.

        At the conclusion of an objection proceeding, the Commonwealth Court may award costs "as it shall deem just." §2937. "[A]n award of costs to the prevailing party is not warranted solely on the basis that the party prevailed in the underlying nomination petition challenge." In re Farnese, 17 A.3d 357, 369 (Pa. 2011) (reversing an award of costs to candidate). An award of costs may be appropriate where "fraud, bad faith, or gross misconduct is proven, ... [but] a party's conduct need not proceed to such an extreme before an award of costs may be dictated by justice." Id., at 372. In awarding costs, the Commonwealth Court must keep in mind: the candidate's right to run for office; the voters' right to elect the candidate of their choice; that objections serve an

---

[15] The SURE system is a statewide database of registered electors which the Pennsylvania Department of State maintains. The system contains the name, address, voting district and signature of all registered voters. Defs.' Statement of Undisputed Facts ¶ 23.

important check on the nomination process; and that "both parties in election contests are operating within the truncated timeframes[16] of the Election Code." Id. at 372 – 73.

### b)   Recent Elections

In 2000, 2002 and 2004, the minor parties had candidates on Pennsylvania's general election ballot. Pennsylvania Department of State, Election Returns, http://www.electionreturns.state.pa.us. Each of the plaintiffs crossed the 2% threshold in 2004 and attained minor party status. See Pls.' Statement of Undisputed Facts ¶ 15. Ralph Nader and Peter Camejo also attempted to place their names on the 2004 ballot as independent candidates for President and Vice President respectively. However, private parties successfully challenged the Nader/Camejo nomination papers, and the Commonwealth Court removed the independent candidates from the ballot. Additionally, the Court ordered the independent candidates to pay the objectors' court costs in the amount of $81,102.19 upon a finding of extensive fraud and deception in the signature gathering efforts. In re Nader, 905 A.2d 450, 459, 466 (Pa. 2006) cert. denied 549 U.S. 1117 (2007). This was the first time costs were assessed against a defending candidate for failing to submit the required number of valid signatures.[17] Aichele, 757 F.3d at 353; Pls.' Statement of Undisputed Facts ¶ 16. The imposition of such substantial costs was

---

[16] Thus, candidates file signatures well in excess of the number required to access the ballot, and objectors have limited opportunity to investigate nomination papers prior to filing objections. In re Farnese, 17 A.3d at 373.

[17] That is not to say that the Commonwealth Court was unfamiliar with its discretion to impose costs. The Court has assessed costs against a candidate who did not meet the residency requirements. In re Nomination Petitions of McIntyre, 778 A.2d 746 (Pa. Commw. Ct. 2001). The Court has regularly awarded costs against unsuccessful challengers. In re Nomination Petition of Cooper, 643 A.2d 717 (Pa. Commw. Ct. 1994); Petition of Hennessey, 606 A.2d 612 (Pa. Commw. Ct. 1992); In re Wagner, 516 A.2d 1276 (Pa. Commw. Ct. 1986); In re Johnson, 516 A.2d 1290, 1293 (Pa. Commw. Ct. 1985). In one case, the Commonwealth Court taxed costs against a defending Democratic legislative candidate who did not have enough valid signatures, but the Supreme Court reversed the order finding the petition to set aside was untimely. In re Lee, 578 A.2d 1277, 1279 (Pa. 1990). Finally, in a confusing decision, the Court ordered a Democratic legislative candidate, who successfully fended off a residency challenge, to pay his challenger's costs. In re T. Milton Street, 516 A.2d 791, 796 (Pa. Commw. Ct. 1986).

shocking to plaintiffs and has hindered the minor parties' efforts to recruit and place candidates on the general election ballot.

In 2006, the CPPA, GPPA and LPPA nominated candidates for Governor, Lieutenant Governor and U.S. Senate.[18] Pls.' Statement of Undisputed Facts ¶ 17. Due to the threat of litigation costs, the CPPA and LPPA candidates refused to file nomination papers. Id. The GPPA candidates filed nomination papers and an objection was filed. For fear of cost shifting, Marakay Rogers and Christina Valente, the GPPA candidates for Governor and Lieutenant Governor, withdrew from the election upon receiving the challenge. Id.; First Decl. of Christina Valente, doc. no. 46-1 at 13-14,[19] ¶ 5. Carl Romanelli, the GPPA candidate for United States Senate, was the only minor party candidate to defend his nomination papers. Pls.' Statement of Undisputed Facts ¶ 18. Mr. Romanelli's defense was unsuccessful.

The Commonwealth Court ordered Mr. Romanelli and the objectors to each provide nine individuals to verify signatures for each day of the challenge, In re Nomination Paper of Rogers, 942 A.2d 915, 920 (Pa. Commw. Ct.) aff'd sub nom. In re Rogers, 959 A.2d 903 (Pa. 2008), but Mr. Romanelli was unable to comply with this order. Rather, on average, only six individuals were present for Mr. Romanelli during the 29 days of proceedings. Id. at 926. Despite Mr. Romanelli filing 99,802 signatures, the challengers were able to successfully strike over 32,000 signatures, and the court set aside the nomination papers. Pls.' Statement of Undisputed Facts ¶ 18. As a result, no

---

[18] The CPPA nominated Jim Panyard for Governor and Hagan Smith for U.S. Senate. The GPPA nominated Marakay Rogers for Governor, Christina Valente for and Lieutenant Governor and Carl Romanelli for U.S. Senate. The LPPA nominated Ken Krawchuk for U.S. Senate.

[19] All citations to page numbers in the record refer to the pagination created by ECF.

plaintiff fielded a candidate in the 2006 election and each lost their status as a minor party. Pls.' Statement of Undisputed Facts ¶ 20.

The Commonwealth Court awarded costs to Mr. Romanelli's challengers in the amount of $80,407.56. In re Nomination Paper of Rogers, 942 A.2d at 930. The first portion of the award represented court and witness fees in the amount of $32,122.56. Id. at 923 – 927.[20] The court awarded this amount pursuant to §2937 because Mr. Romanelli's failure to provide nine workers each day unnecessarily prolonged the review process. Id. at 926. The second portion of the award was for the challengers' counsel fees totaling $48,285.00.[21] Id. at 929. Since the Election Code does not authorize the imposition of attorney fees, the court relied on the Judicial Code which allows for counsel fees as a sanction for "dilatory, obdurate or vexatious conduct." Id. at 928 (citing 42 Pa.C.S. § 2503(7)). In addition to failing to provide adequate signature verifiers, the court found that Mr. Romanelli and his counsel had been disingenuous in their representations that they could rehabilitate enough signatures to keep Mr. Romanelli on the ballot. Id. at 922. Thus, the Court found that the conduct of Mr.Romanelli had "crossed the line into bad faith" warranting attorney's fees.[22] Id. at 928.

---

[20] The court cost and fees included $25,481.13 for the ten individuals who verified and tabulated signatures for the challengers ($87.86 x 10 person x 29 days); $1,500 for handwriting experts; and $3,726.28 for stenographic and transcription costs. In re Nomination Paper of Rogers, 942 A.2d 915, 923 - 927 (Pa. Commw. Ct. 2008).

[21] Counsel's hourly was rate $185. The court extended this cost out 9 hours a day for 29 days. In re Nomination Paper of Rogers, 942 A.2d at 927.

[22] Specifically, the Commonwealth Court found:

> Candidate was not cooperative, often times disingenuous to the process. There is a duty and obligation upon the parties, counsel and this Court to advance the proceedings because of the Court's mandate under the Election Code to resolve these matters expeditiously. It must be recognized in the election process that there is the right of a candidate to participate and the right to challenge the validity of a candidacy. The parties must proceed with the greatest candor to ensure that the process moves quickly and efficiently. A candidate who is cooperative does not delay in such important matters.

In 2008, the LPPA fielded candidates for President, Vice President, Attorney General, Auditor General and Treasurer, and their nomination papers went unchallenged.[23] Pls' Statement of Undisputed Facts ¶ 22. While the national Constitution and Green Parties nominated candidates for President and Vice President in 2008, the parties did not file nomination papers in Pennsylvania because "supporters were unwilling to devote time and resources to a petition drive that could result in substantial assessment of costs against their nominees." Pls' Statement of Undisputed Facts ¶ 23.

In 2010, the LPPA and GPPA candidates filed nomination papers for U.S. Senator and Governor. John Krupa, CPPA's 2010 nominee for Governor, did not submit papers to the Department of State because he could not afford to incur litigation costs. Id. ¶ 28. Challengers aided by the Democratic and Republican parties objected to the LPPA and GPPA nomination papers. As a result, Melvin Packer, GPPA's nominee for U.S. Senate, withdrew his nomination papers. Id. ¶ 27. On August 16, Ronald Hicks, Esq., the attorney representing LPPA's challengers, sent an email to Marc Arrigo, Esq., LPPA's attorney, stating:

> Following up on our conversation earlier this evening, I do not have exact figures on what our costs will be if this signature count continues and my clients are required to complete the review and/or move forward with a

---

Candidate has had more than adequate time to comply with the orders of this Court. Candidate's failure to comply alone is a sufficient reason to disallow rehabilitation, regardless of waiver. This Court believes that Candidate's cumulative disingenuousness in these proceedings has crossed the line into bad faith on the part of Candidate and his counsel.

In re Nomination Paper of Rogers, 942 A.2d 915, 928-29 (Pa. Commw. Ct. 2008).

[23] In 2008, Attorney General Tom Corbett was investigating the illegal use of state resources to support political campaigns. The resulting presentment detailed how staff of the Pennsylvania House Democratic Caucus orchestrated and supported the challenges to Ralph Nader's and Carl Romanelli's nomination papers. See Presentment of the 28th Statewide Investigating Grand Jury, http://old.post-gazette.com/downloads/harrisburg_presentment.pdf (last visited June 8, 2015), at 58-59. The LPPA theorizes their papers were not challenged due to the higher scrutiny that was focused on the nomination paper objection process. Pls.' Satement of Undisputed Facts ¶ 21.

> hearing. However, a rough estimate would be $92,255 to $106,455….
> These costs are comparable to the costs awarded in recent years by the
> Commonwealth Court in similar nomination paper challenges… which, as
> you know, were assessed not only against the candidates but also their
> lawyers and their law firms.

Pls.' Statement of Undisputed Facts ¶ 25. The LPPA candidates withdrew their

nomination papers the next day. Id. ¶ 26. As a result, only Democratic and Republican

candidates appeared on the 2010 general election ballot. Id. ¶ 29.

In 2012, Jill Stein and Cheri Honkala, the Green Party Candidates for President

and Vice President, filed nomination papers which went unchallenged. Id. ¶ 39. On

August 8, 2012, private parties filed challenges to the nomination papers submitted by the

CPPA and LPPA. Id. ¶ 33. On August 10, 2012, the Commonwealth Court filed an order

in each objection proceeding:

> Each party shall have present 20 individuals, in addition to counsel, who
> are capable of performing computer searches utilizing the SURE system….
> The signature review will continue between the hours of 8:30 a.m. and 5:00
> p.m., Monday through Friday until further order of Court…. The
> individuals designated by the parties shall review the challenged signatures
> commencing with those alleged to be unregistered and shall tabulate the
> number of signature stipulated to be valid and those stipulated to be invalid.

Order, *In re: Goode,* No. 508 M.D. 2012, doc. no. 60-1 at 8-11, ¶¶ 4 and 5 (August 10,

2012); Order, *In re: Robinson*, No. 507 M.D. 2012, doc. no. 60-1 at 56. The signature

review commenced on August 20, 2012. Id.

The 2012 CPPA candidates[24] submitted 36,000 total signatures to satisfy the

20,601 signature requirement. Decl. of Alan Goodrigch, doc. no. 60-1 at 2-6, ¶ 6. To

survive the challenge the CPPA needed a validity rate of approximately 57%, but by the

---

[24] CPPA's slate of candidates in 2012 included: Virgil H. Good for President, Jim Clymer for Vice President, Donna
Fike for Treasurer and Alan Goodrich for Auditor General. Decl. of Alan Goodrich, doc. no. 60-1 at 2-6, ¶¶ 4 and 5.

end of the first day, the CPPA only had a 30% validity rate.[25] Id. at ¶ 8. On the second

day, the challengers' attorney threatened to seek costs against the CPPA and its

candidates personally unless the CPPA withdrew its nomination papers. Pls.' Statement

of Undisputed Facts ¶ 36. The Commonwealth Court also warned the CPPA that it would

consider a motion for costs and fees if the CPPA pursued its defense. Third Decl. of

James Clymer, doc. no. 46-1 at 36-38, ¶ 10; Defs.' Resp. to Pls.' Statement of

Undisputed Facts ¶ 36. The CPPA candidates withdrew their nomination papers because

they were concerned by the number of signatures that were being invalidated and they did

not believe they could continue to provide 20 workers to review signatures. Decl. of Alan

Goodrich ¶ 11; *Compare* Pls.' Statement of Undisputed Facts ¶ 36 *with* Defs.' Resp. to

Pls.' Statement of Undisputed Facts ¶ 36.[26] According to the CPPA,[27] its defense cost

$10,000 to $15,000. Pls.' Statement of Undisputed Facts ¶ 50.

The 2012 LPPA candidates[28] submitted 49,164 signatures to the Department of

State. Decl. of William Redpath, doc. no. 60-1 at 51-54, ¶ 5. Commonwealth Court Judge

James Gardner Collins ordered the candidates to provide 20 workers to validate

---

[25] Plaintiffs argue that the challengers were able to invalidate signatures of qualified, registered voters based on hyper-technicalities. Decl. of Alan Goodrich ¶ 8.

[26] The parties dispute the primary reasoning behind the CPPA candidates' withdraw from the election. Plaintiffs contend the candidates withdrew because they could not provide 20 workers per day to verify signatures. Defendants assert that the candidates withdrew because they did not have enough valid signatures. I have included both theories in the discussion, but I will not rely on either alleged fact in deciding the motions.

[27] Defendants maintain that the estimation of defense costs in this case are too vague and lack sufficient evidentiary support to be given any weight. Defs.' Resp. to Pls.' Statement of Undisputed Facts ¶ 50. According to defendants, $15,000 is an unreasonable amount to spend on an objection which consisted of a single court hearing and at most two days of signature review. Id. Since this fact is in dispute, I will not rely on the costs averred by the CPPA in deciding these motions. However, I think it is fair to say that the CPPA's costs were not insignificant.

[28] The LPPA candidates included Gary Johnson for President, James Gray for Vice President, Rayburn Smith for Senator, Marakay Rogers for Attorney General, Betsy Summers for Auditor General and Patricia Fryman for State Treasurer. 2012 General Election Official Returns, Pennsylvania Department of State, http://www.electionreturns.state.pa.us/Default.aspx?EID=27&ESTID=2&CID=0&OID=0&CDID=0&PID=0&DIST ID=0&IsSpecial=0 (last updated May 13, 2015)

signatures for the first 10 days of the challenge. Decl. of Paul Rossi, doc. no. 60-1 at 74-86, ¶ 13; Defs.' Resp. to Pls.' Statement of Undisputed Facts ¶ 42. Judge Collins only required eight workers for the last three days of review. Id. At the conclusion of signature review, the parties stipulated that 12,686 signatures remained contested. Id. ¶ 24. The parties argued the legal validity of the remaining signatures until Judge Collins denied the objection on October 10, 2012. Id. ¶ 36.

The LPPA successfully defended the nomination papers undeterred by threats that the challengers would move for $100,000 in costs. Pls.' Statement of Undisputed Facts ¶ 37. The defense was an all-consuming task. The LPPA expended at least $47,500[29] on the effort and recruited over 70 volunteers to validate signatures. Id. ¶¶ 52, 53. The LPPA received significant support from the Libertarian National Committee and the campaign of Gary Johnson, the Libertarian candidate for president. Id. ¶ 55, 56. The LPPA expended most of their resources on the nomination challenge to the detriment of the 2012 campaign. Decl. of Steve Sheetz, doc. no. 60-1 at 69-73, ¶ 8.

No CPPA, GPPA or LPPA candidate was able to gather enough signatures to submit nomination papers to the Department of State for the 2014 Gubernatorial Election. Pls.' Statement of Undisputed Facts ¶ 40. According to plaintiffs, their unsuccessful 2014 petition drive resulted from the combined effect of § 2911(b) and § 2937.

---

[29] The LPPA submits detailed evidence supporting the cost of its defense. The defendants, however, deny "that all of this money was spent efficiently or wisely or was necessary to successfully defend the objection case." Defs.' Resp. to Pls.' Statement of Undisputed Facts ¶ 50. If defendants wish to create a disputed issue of fact, they should point to evidence of record rather than pure conjecture. Furthermore, the LPPA's claimed costs are substantially lower than, and therefore consistent with, the costs assessed against Mr. Nader and Mr. Romanelli. Considering that the LPPA 2012 effort extended for a longer period of time and required more workers than either the 2004 or 2006 challenges, these costs seem modest.

> Members and supporters of CPPA, GPPA and LPPA are increasingly
> unwilling to dedicate the time and resources necessary to conduct a
> successful petition drive, because they know that the filing of a challenge
> pursuant to section 2937 may force the petitions to be withdrawn, whether
> or not they include enough valid signatures to comply with Section 2911(b)

Pls.' Statement of Undisputed Facts ¶ 46.[30] Additionally, unlike 2012, the GPPA and

LPPA did not have a presidential campaign to assist with signature gathering or

defending nomination papers. Decl. of John Sweeney, doc. no. 60-1 at pp. 12 – 15, ¶ 6;

Decl. of William Redpath ¶ 12. Since the plaintiffs did not field any candidates in 2014,

they are currently classified as "political bodies."

### c)        Procedural History

Plaintiffs filed their complaint on May 17, 2012 in the middle of the signature

drive to place minor party candidates on the general election ballot. Aichele, 757 F.3d at

356. "Count I alleges that §§ 2911(b) and 2937 violate the Aspiring Parties'[31] 'freedoms

of speech, petition, assembly, and association for political purposes' under the First and

Fourteenth Amendments by imposing substantial financial burdens on them to defend

their nomination papers." Id. "Count II alleges that §§ 2911(b) and 2937 violate the

Aspiring Parties' right to equal protection under the Fourteenth Amendment by requiring

them to bear the costs of validating nomination papers, while Republican and Democratic

Party candidates are placed on the general election ballots automatically and by means of

publicly funded primary elections." Id. "Count III alleges that § 2937 is unconstitutional

on its face for authorizing the imposition of costs against candidates, even if they do not

---

[30]Defendants do not deny that plaintiffs failed to nominate a gubernatorial candidate in 2014 for fear of the financial burdens imposed by §2937. Defs.' Resp. to Pls.' Statement of Undisputed Facts ¶ 46. "[Defendants] do however deny that [plaintiffs'] logic is sound, based upon a reasonable interpretation of 2937…." Id. Defendants' position does not create a disputed issue of fact.

[31] The Third Circuit referred to the minor parties as aspiring parties. Aichele, 757 F.3d at 350 n. 2.

engage in misconduct, thereby chilling First Amendment rights to freedom of speech, petition, assembly, and association." Id.

Following a hearing on September 11, 2012, I dismissed the complaint ruling that the plaintiffs lacked standing. Constitution Party v. Aichele, No. CIV.A. 12-2726, 2013 WL 867183, at *7 (E.D. Pa. Mar. 8, 2013). "A party facing prospective injury has standing to sue where the threatened injury is real, immediate and direct." Davis v. FEC, 554 U.S. 724, 734 (2008). I concluded that allegations of the past enforcement of Section 2937 did not establish the likelihood that costs would be assessed against the plaintiffs in the future. On appeal, the Third Circuit reversed. Relying on Susan B. Anthony List v. Driehaus, 134 S.Ct. 2334, 2346 (2014), the court found that "the threat of cost shifting [was] entirely believable in light of recent history." Aichele, 757 F.3d at 364.[32] The Court of Appeals' opinion only addressed the issue of standing and did not reach the merits of the case. Nonetheless, several of the court's observations are relevant to the resolution of the pending motions.

---

[32] When I dismissed the complaint, I did not have the benefit of the Supreme Court's opinion in Susan B. Anthony List v. Driehaus which bears a remarkable resemblance to the facts of this case. The Susan B. Anthony List (SBA), a pro-life advocacy organization, complained of an Ohio statute which prohibits "certain 'false statements' 'during the course of any campaign for nomination or election to public office or office of a political party.'" 134 S.Ct. 2334, 2338 (2014). Any person can file a complaint with the Ohio Election Commission alleging a violation of the statute. Id. A violation of the statute is a first – degree misdemeanor punishable by up to a six month prison sentence and a $5,000 fine. Id. at 2339.

Former Congressman Stephen Driehaus filed a complaint with the Commission alleging that the SBA had made a false statement about his vote for the Affordable Care Act. Id. The SBA maintained that its characterization of Mr. Driehaus's vote was true. Id. The Commission found probable cause that the SBA violated the statute, but Mr. Driehaus withdrew the complaint after he lost the election. Id. at 2340. Nonetheless, the SBA sued in federal court alleging the statute chilled their protected political speech. The district court dismissed the case for lack of standing, and the Sixth Circuit affirmed holding "that SBA's prior injuries… 'do not help it show an imminent threat of future prosecution'…." Id.

The Supreme Court reversed finding that several of the complaints well-pleaded allegations established a threat of imminent injury. First, the Court noted that the history of prior enforcement was good evidence the statute would be enforced against the SBA in the future. Second, the statute permitted anyone with personal knowledge of a violation to file a complaint. Therefore, the statute was subject to abuse by political adversaries. Third, the credibility of the threat was bolstered by the frequency with which false statement complaints were filed with the commission. As I discuss throughout this memorandum, Section 2937 displays these same hallmarks.

On remand, plaintiffs filed an amended complaint adding new facts describing events which occurred since they filed the original complaint in 2012. The counts remain the same. Plaintiffs request a declaratory judgment that 25 P.S. § 2911(b) and 25 P.S. § 2937 are unconstitutional as applied to plaintiffs and that § 2937 is invalid on its face. Plaintiffs and defendants have filed cross motions for summary judgment which are now ripe for disposition.

## II      Legal Standard

A motion for summary judgment may be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper when no "reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A party seeking summary judgment initially bears the burden of identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is therefore appropriate when the non-moving party fails to rebut the moving party's argument by pointing to evidence that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "Evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

**III    Discussion**

### a) Counts I and II – Section 2937 and Section 2911(b), as applied to plaintiffs, violate the First and Fourteenth Amendments

I will analyze Counts I and II together because, in the ballot access context, freedom of association claims and equal protection claims are nearly identical. The Third Circuit has recognized that "equal protection challenges essentially constitute a branch of the associational rights tree." Rogers, 468 F.3d at 194 (citing Republican Party of Arkansas v. Faulkner Co., 49 F.3d 1289, 1293 n.2 (8th Cir. 1950)). "A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment." Anderson v. Celebrezze, 460 U.S. 780, 793 (1983). Thus, the framework established by Anderson governs my review of both Counts I and II. *See* Rogers, 478 F.3d at 194 ("[W]e conclude that Anderson sets out the proper method for balancing both associational and equal protection concerns and the burdens that the challenged law creates on these protection as weighed against the proffered state interests.").

The fact that both Counts I and II assert as-applied challenges also supports my joint review of these claims. An as-applied attack contends that a law's "application to a particular person under particular circumstances deprived that person of a constitutional right." United States v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010) (citing Wis. Right to Life, Inc. v. FEC, 546 U.S. 410, 411–12 (2006). A successful as-applied attack blocks the enforcement of a statute against the plaintiff alone. *See* Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 331 (2010). As-applied challenges fundamentally differ

from facial challenges. I will address these differences in greater detail in my discussion of Count III which avers that the Section 2937 is facially invalid.

### 1) The <u>Anderson</u> Test

"Restrictions on ballot access burden [the] fundamental right[]… 'of individuals to associate for the advancement of political beliefs.'" <u>llinois State Bd. of Elections v. Socialist Workers Party</u>, 440 U.S. 173, 184 (1979) (citing <u>Williams v. Rhodes</u>, 393 U.S. 23, 30(1968)). A state law which affects the exercise of a fundamental right is "subject to strict scrutiny and will pass constitutional muster only if it is narrowly tailored to serve a compelling state interest." <u>Maldonado v. Houstoun</u>, 157 F.3d 179, 184 (3d Cir. 1998) (citations omitted). However, ballot access cases are an exception. Traditional strict scrutiny analysis does not apply. Rather, <u>Anderson</u> teaches that I must balance the burden the state regulation imposes on plaintiffs' associational rights against the asserted state interest for the rule. 460 U.S. at 789.

Under <u>Anderson</u>, I "first consider the character and magnitude of the asserted injury" to plaintiffs' association rights. 460 U.S. at 789. Freedom to associate for political ends has little practical value if the plaintiffs cannot place their candidates on the ballot and have an equal opportunity to win votes. <u>Illinois State Bd. of Elections</u>, 440 U.S. at 184 (citing <u>Williams v. Rhodes</u>, 393 U.S. 23, 30(1968)). Furthermore, the impact of Section 2911(b) and Section 2937 on voters is relevant to this inquiry. *See* <u>Illinois State Bd. of Elections</u>, 440 U.S. at 184 (ballot access restrictions also burden the fundamental right of voters to "cast their votes effectively"). This is because "the rights of voters and the rights of candidates do not lend themselves to neat separation….." <u>Bullock v. Carter</u>,

405 U.S. 134, 143 (1972). Ballot access regulations may impinge on voters' rights by "limit[ing] the field of candidates from which voters might choose." Anderson, 460 U.S. at 786 (quoting Bullock, 405 U.S. at 143).

After considering the magnitude of the burden, I "must identify and evaluate the precise interests put forward by the state as justifications for the burden imposed by its rule." Id. at 789. The Constitution grants Pennsylvania broad power to regulate elections. See Clingman v. Beaver, 544 U.S. 581, 586 (2005) (citing Art. I, § 4, cl. 1; Tashjian v. Republican Party of Conn., 479 U.S. 208, 217 (1986)). The Supreme Court has recognized that some regulation is necessary to preserve the integrity of the democratic process and to ensure that elections are fair and produce reliable results. Anderson, 460 U.S. at 788. Inevitably, each election regulation will have some effect on the "individual's right to vote and his right to associate with others for political ends." Id. It follows, therefore, that not every burden on the right to vote and freedom to associate can offend the Constitution if we are to have a workable Election Code. Belitskus v. Pizzingrilli, 343 F.3d 632, 643 (3d Cir. 2003) (citations omitted).

Finally, I "must … determine the legitimacy and strength of each of [the state] interests, [and] the extent to which those interests make it necessary to burden the plaintiff's rights." Anderson, 460 U.S. at 789. "The results of this evaluation will not be automatic; …there is 'no substitute for the hard judgments that must be made.'" Id. at 789-90 (citing Storer v. Brown, 415 U.S. 724, 730 (1974)). Pennsylvania must regulate elections "by a means that does not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally important interest in the continued

availability of political opportunity." <u>Lubin v. Panish</u>, 415 U.S. 709, 716 (1974). "[I]t is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." <u>Anderson</u>, 460 U.S. at 793. "[B]allot access must be genuinely open to all, subject to reasonable requirements." <u>Lubin</u>, 415 U.S. at 719 (citing <u>Jenness v. Fortson</u>, 403 U.S. 431, 439 (1971)).

Later cases have adopted a two-track approach to analyzing ballot access claims. <u>Crawford v. Marion county Election Bd.</u>, 553 U.S. 181, 205 (2008) (Scalia, J., concurring) ("<u>Burdick</u> forged <u>Anderson</u>'s amorphous 'flexible standard' into something resembling an administrable rule." (citing <u>Burdick v. Takushi</u>, 504 U.S. 428 (1992))). When the right to vote and freedom to associate "are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" <u>Burdick</u>, 504 U.S. at 434 (citing <u>Norman v. Reed</u>, 502 U.S. 279, 289 (1992)). "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." <u>Burdick</u>, 504 U.S. at 434 (quoting <u>Anderson</u>, 460 U.S. at 788). Thus, while strict scrutiny does not automatically apply to ballot access claims, an election regulation may be subject to strict scrutiny review if the regulation is sufficiently severe. <u>Crawford</u>, 553 U.S. at 205.

Accordingly, the first step in the <u>Anderson</u> analysis is to determine the severity of the burden. <u>Belitskus</u>, 343 F.3d 644 (3d Cir. 2003). While <u>Burdick</u> refined the <u>Anderson</u>

standard, the Supreme Court has not set forth a clear test for what constitutes a severe burden. *See* Timmons v. Twin Cities Area New Party, 520 U.S. 351, 359 (1997) ("No bright line separates permissible election-related regulation from unconstitutional infringements."); Demian A. Ordway, Disenfranchisement and the Constitution: Finding A Standard That Works, 82 N.Y.U. L. Rev. 1174, 1192 (2007) ("The word 'burden' is exceedingly vague when left unqualified, inviting courts to make ad hoc judgments concerning what is 'excessive' and what is 'reasonable.'"). Justice Scalia has suggested that a burden is "severe if it goes beyond the merely inconvenient." Crawford, 553 U.S. at 205. In Storer v. Brown, the court asked "could a reasonably diligent independent candidate be expected to satisfy" the suspect regulation. 415 U.S. 724, 742 (1974). In yet another case, the court found that "the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." Williams v. Rhodes, 393 U.S. at 31. "Past experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not." Storer, 415 U.S. at 742 (1974).

State election regulations which impose financial burdens on candidates are severe if they work to exclude legitimate candidates from the ballot. Bullock, 405 U.S. at 143. The Bullock Court considered a Texas statute which placed the burden of financing the primary election on the candidates rather than the government. Id. at 139. The statute accomplished this by charging a filing fee proportionate to the salary of the office sought. Id. at 138. The fees assessed against the plaintiffs in that case ranged from $1000 to

$6,300. Id. at 136. Adjusted for inflation, those fees would be $5,660 to $35,000 in 2015.

Bureau of Labor and Statistics, CPI Inflation Calculator, http://data.bls.gov.cgi-

bin/cpicalc.pl (last visited June 11, 2015). These are not the type of fees "that most

candidates could be expected to fulfill from their own resources or at least through

modest contributions." Bullock, 405 U.S. at 143.

The Bullock Court found the size of the fees had a "patently exclusionary

character." Id. at 143. Since the statute provided no alternative means of accessing the

ballot, "[m]any potential office seekers lacking both personal wealth and affluent backers

are in every practical sense precluded from seeking the nomination of their chosen party,

no matter how qualified they might be, and no matter how broad or enthusiastic their

popular support." Id. Furthermore, the exclusionary fees would limit the voters' choice of

candidates and would fall with unequal weight "on the less affluent segment of the

community, whose favorites may be unable to pay the large costs required by the Texas

system." Id. at 144.

> By requiring candidates to shoulder the costs of conducting primary
> elections through filing fees and by providing no reasonable alternative
> means of access to the ballot, the State of Texas has erected a system that
> utilizes the criterion of ability to pay as a condition to being on the ballot,
> thus excluding some candidates otherwise qualified and denying an
> undetermined number of voters the opportunity to vote for candidates of
> their choice.

Id. at 149. Accordingly, the court subjected the law to strict scrutiny and invalidated the

statute. Id.

Building on Bullock, the Court in Lubin strictly scrutinized California's

substantially smaller filing fees. 415 U.S. at 710 ($701.60 filing fee). The Lubin Court

23

focused on the lack of alternative means to access the ballot and held that "a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay." Id. at 718. Such alternative means include requiring minor political parties "to file petitions for a place on the ballot signed by a percentage of those who voted in a prior election." Id. (citing American Party of Texas v. White, 415 U.S. 767 (1974). Relying on Lubin, the Third Circuit recently invalidated Pennsylvania's filing fees which ranged from $5 to $200. Belitskus, 343 F.3d at 636, 647. The Court reasoned that "[i]n the absence of a reasonable alternative means of ballot access, any mandatory fee, **no matter how small**, will inevitably remain 'exclusionary as to some aspirants.'" Id. at 645 (emphasis added) (citing Lubin, 415 U.S. at 718).

Significantly for this case, the Eleventh Circuit invalidated a Florida statute which required minor party candidates to pay for petition signature verification. Fulani v. Krivanek, 973 F.2d 1539 (11th Cir. 1992). In Florida, county employees of the Supervisors of Elections verify the signatures on nomination petitions. *See* Id. at 1540. However, Florida statute authorized the supervisors to charge candidates a ten cent per signature verification fee. Id. The statute also provided for a fee waiver for indigent Democratic and Republican candidates, but specifically denied the fee waiver to minor party candidates. Id. (citing Fla. Stat. § 99.097(4)). In 1988, Ms. Fulani, a minor party candidate for President, had to submit petitions containing 56,312 signatures to access Florida's general election ballot. Id. at 1540. (citing Fla. Stat. § 103.021(3)). The signature verification fee was $5,631.20. Id. (citing Fla. Stat. § 99.097(1)(b)). The Eleventh Circuit found that the fee structure placed an unequal burden on minor party

24

candidates and made it more difficult for minor party candidates to access the ballot. Id. at 1544 - 45. The Court of Appeals invalidated the statute because the state was unable to identify any interest to justify the burden. Id. at 1547.

### 2) Section 2911(b) and Section 2937 impose a severe and unequal burden on plaintiffs' associational rights.

The combined effect of Section 2911(b) and Section 2937 imposes a severe burden on plaintiffs' associational rights. The potential costs which a minor party must absorb are astonishing. A minor party's defense of nomination papers, if taken to its conclusion, can cost up to $50,000. If that defense is unsuccessful, the party may then be liable for the challenger's costs which, in the last eleven years, have twice been levied in excess of $80,000. Thus, a minor party candidate who seriously wants to place his or her name on the general election ballot must be prepared to assume a $130,000 financial liability. This figure is staggering and would deter a reasonable candidate from running for office. See Storer, 415 U.S. at 742. These costs go far beyond what the Bullock Court considered to be "patently exclusionary." 405 U.S. at 143.

I recognize that the costs of defending a nomination paper in Pennsylvania differ from the fees imposed by the statutes discussed in Bullock and its progeny. There are no mandatory fees to file nomination papers in Pennsylvania. Belitskus, 343 F.3d at 636, 647. Theoretically, a minor party candidate should only incur costs of a defense when there is a problem with his or her nomination paper. Realistically, however, a minor party candidate can expect an aggressive challenge to his or her nomination paper and a failed defense will lead to great costs. See Bullock, 405 U.S. at 143 ("In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their

impact on voters."). Recent history shows that a nomination paper challenge is a near certainty. These challenges seem to be filed without regard for the strength of a candidate's support or the number of signatures collected. There is no realistic way for a minor party candidate to avoid the cost of defending an objection. The near certainty of incurring costs pursuant to §2937 brings the facts of this case in line with Bullock.

Additionally, a motion for costs has become a routine weapon which major party challengers deploy against the minor party candidates. As the Third Circuit observed in the appeal of this matter, the major party challengers have used the decisions in In re Nader and In re Nomination Paper of Rogers "as a cudgel against non-major parties and their candidates." Aichele, 757 F.3d at 363.[33] "The threat of cost shifting, entirely believable in light of recent history, chills the Aspiring Parties' electioneering activities." Id. at 364. If a minor party candidate wishes to run in the general election, he has no alternative but to bear the cost of signature validation and the risk that he will have to pay his opponent's costs as well. Cf. Susan B. Anthony List, 134 S.Ct. at 2346 (there is a "real risk" objections will be filed since they may be filed by political opponents).

While the cost of ballot access is problematic under Bullock, the lack of alternative means to access the ballot creates problems pursuant to Lubin and Belitskus. The typical alternative to onerous ballot access costs is higher signature requirements for minor party candidates, Lubin, 415 U.S. at 718, but the Election Code already demands more signatures from minor party candidates than it does of the major parties. Compare §2372.1 with § 2911(b). It is the combined effect of the signature requirement with

---

[33] While the Third Circuit made these findings in a different procedural posture, they were based on facts alleged in the complaint which the plaintiffs have proven and the defendants have been unable to controvert. Defendants do not deny that major party challengers now routinely threaten minor party candidates with motions for costs.

Section 2937's signature validation procedures which creates the substantial burdens in this case. Storer, 415 U.S. 727 ("[A] number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights."). Thus, an additional signature requirement would not provide an alternative means to ballot access. "By failing to provide such an alternative, the Commonwealth has made economic status a decisive factor in determining ballot access [and] has run afoul of the Supreme Court's ballot access jurisprudence." Belitskus, 343 F.3d at 647 (citing Anderson, 460 U.S. at 805).

The burdens imposed by Pennsylvania's Election Code are not only financial in nature. A nomination paper challenge involves a substantial investment in time and resources. In 2012, the LPPA recruited 70 volunteers, their strongest supporters, to validate signatures.[34] The objection proceedings extended from August 20 until October 10. Decl. of Paul Rossi ¶¶ 11, 36. As a result, the LPPA's general election resources were completely diverted to the nomination paper defense. See Susan B. Anthony List, 134 S.Ct. at 2346 (expressing concern that a commission proceeding requires the target "to divert significant time and resources … in the crucial days leading up to an election"). By essentially silencing minor parties during the heat of a campaign, Section 2911(b) and Section 2937 render the plaintiffs' associational rights meaningless. See Illinois State Bd. of Elections, 440 U.S. at 184 ("The freedom to associate as a political party … has diminished practical value if the party can be kept off the ballot" (citing Williams v. Rhodes, 393 U.S. 23, 30(1968)).

---

[34] While this work has, at times, been performed by hired temp workers, the plaintiffs fare much better when the work is performed by people who support the candidate. Pls.' Statement of Undisputed Facts ¶ 59.

The chilling effect of Pennsylvania's regime is not temporally limited to the pendency of a challenge proceeding. The minor parties cannot grow within the confines of the Election Code. First, the parties have had trouble recruiting candidates because members have been unwilling to submit nomination petitions for fear of shifting litigation costs. Second, members of the minor parties see electioneering as a futile effort. They believe that even if they collect enough signatures to place a candidate on the ballot, the nomination papers will be challenged and the candidate will withdraw from the election. Pls.' Statement of Undisputed Facts ¶ 46. The ability of the minor parties to organize and voice their views has been decimated by Section 2911(b) and Section 2937. *See* Aichele, 757 F.3d at 364 ("When [plaintiffs] submit nomination papers as they must under § 2911(b), they face the prospect of cost-shifting sanctions, the very fact of which inherently burdens their electioneering activity." (citing Susan B. Anthony List v. Driehaus, 134 S.Ct. 2334, 2346 (2014)). The plaintiffs' right to develop their political parties has been severely burdened. *See* Noman v. Reed, 502 U.S. 279, 288 (1992) (citizens have a constitutional right to create and develop new political parties).

The severity of the burdens imposed by Section 2911(b) and Section 2937 is demonstrated by the disappearance of minor parties from the general election ballot. Storer, 415 U.S. at 742 (1974). ("Past experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not.") Prior to the Pennsylvania Supreme Court's ruling in In re Nader, minor party candidates regularly appeared on the general election ballot. Due to the looming threat of cost and the inability to organize post

In re Nader, no minor party or independent candidates appeared on the ballot in the 2006, 2010 and 2014 elections. The GPPA has only been able to field two candidates[35] since 2004, and CPPA has not made a single appearance on the statewide ballot in the last decade.

The implications for Pennsylvania voters are obvious. Bullock, 405 U.S. at 143 ("[T]he rights of voters and the rights of candidates do not lend themselves to neat separation….."). With few exceptions over the last decade, the electorate has been forced to choose between Democratic and Republican candidates, alone, for statewide office. The fact that the LPPA has been moderately successful during presidential election years does not minimize the impact on voters. The Election Code is hostile to minor parties and threatens to eliminate all competition to the major parties. "By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences." Illinois State Bd. of Elections, 440 U.S. at 184. Thus, Section 2911(b) in combination with Section 2937 severely burdens the right to vote.

The Commonwealth defendants argue that plaintiffs enjoy the equal protection of the law because major party and minor party candidates are subjected to the same burdens under Section 2937. To an extent, this is true. Section 2937 governs challenges made against a major party candidate petitioning for a place on the primary ballot, and the same statute allows for objections to minor party candidate nomination papers. However, the burden of these challenges is not equal. At most, a major party statewide candidate must file 2,000 valid signatures to run in the primary election. To the contrary,

---

[35] These candidates were Jill Stein and Cheri Honkala who ran as a Presidential ticket in 2012.

minor party candidates, on average, must file ten times as many signatures, and of course, they file well in excess of the minimum in anticipation of the inevitable challenge. It is only logical that the cost of defending a minor party nomination paper will far exceed the cost of any major party candidate who must defend far fewer signatures. A challenge to a major party nomination petition would also require less time and less resources. Consequently, cost shifting pursuant to Section 2937 becomes formidable for minor party candidates but not equally so for the major party candidates.

The defendants rely on <u>Rogers</u> to avoid the appearance of inequality. 468 F.3d at 197. They maintain that the minor parties' greater financial burden is solely attributable to the signature requirements in Section 2911(b), and since the signature requirements are constitutionally sound, there can be no equal protection problem. No one is disputing the validity of Section 2911(b). Rather, plaintiffs contend that it is the combined effect of Section 2911(b) and Section 2937 which violate their constitutional rights. It is well established that "a number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights." <u>Storer</u>, 415 U.S. 737. That is what has happened here. Pennsylvania election law imposes a financial burden on political candidates' First Amendment rights proportionate to Section 2911 (b)'s signature requirement. Since statewide minor party candidates will always need to file more signatures than major party candidates, the financial burden of ballot access will always weigh heavier on the minor parties. Pennsylvania may require minor party candidates to submit more signatures than major party candidates to run for office, <u>Rogers</u>, 468 F.3d at 197, but the Commonwealth may not impose a heavier financial

burden on minor parties without depriving the minor parties of the equal protection of the law. <u>Fulani</u>, 973 F.2d 1539.

Defendants note the Pennsylvania Supreme Court held that "Section 2937 does not impinge upon any constitutional rights in a way that would warrant constitutional scrutiny." <u>In re Nader</u> 905 A.2d at 459. The Pennsylvania Supreme Court is competent to adjudicate claims arising under the Constitution of the United States. <u>Burt v. Titlow</u>, 134 S. Ct. 10, 15 (2013). However, the Pennsylvania high court did not have the benefit of the facts developed in this litigation. Indeed, the minor parties did not feel the chilling effects of Section 2937 until after <u>In re Nader</u>. It was the Supreme Court's decision in that case coupled with the sanctions imposed by the Commonwealth Court on Mr. Romanelli which gave rise to the credible threat of astronomical litigation costs.[36] Afterwards, the major party challengers began using these decisions as a tactic to force minor party candidates to withdraw from elections. No other state court decision has since considered the constitutional implications of Section 2937. *See* <u>In re Farnese</u>, 17 A.3d at 373 ("[W]e will not reach the constitutional arguments presented by the objectors, having been able

---

[36] Defendants also argue that I lack jurisdiction to hear a collateral attack on the Supreme Court's decisions in <u>In re Nader</u> and <u>In re Nomination Petitions of Rogers</u>. That is undoubtedly correct. *See* <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413 (1923). However, this cannot be considered collateral attack and the <u>Rooker-Feldman</u> doctrine does not apply because neither Ralph Nader nor Carl Romanelli are parties to this case. *See* <u>Lance v. Dennis</u>, 546 U.S. 459, 464 (2006) ("Rooker–Feldman [is] inapplicable where the party against whom the doctrine is invoked was not a party to the underlying state-court proceeding.").

Otherwise, there is no basis to abstain from this case. <u>Bufford</u> abstention does not apply because plaintiffs are not appealing a state regulatory order capable of state review. <u>Alabama Pub. Serv. Comm'n v. S. Ry. Co.</u>, 341 U.S. 341, 346 (1951). Pullman does not assist defendants because there are no issues of state law capable of resolving the issue. <u>R.R. Comm'n of Tex. v. Pullman Co.</u>, 312 U.S. 496, 501 (1941); see also <u>Kusper v. Pontikes</u>, 414 U.S. 51, 55 (1973). <u>Thiobaux</u> is not implicated because this is not a diversity action involving a novel issue of state law. <u>Louisiana Power & Light Co. v. City of Thibodaux</u>, 360 U.S. 25, 26 (1959). Finally, there are no pending and parallel state actions resembling <u>Younger v. Harris</u>, 401 U.S. 37, 53-54 (1971) or <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 818 (1976).

to decide this case on statutory grounds."). If the Supreme Court reconsidered the issue in light of recent history, the justices may well reach a different result.

Finally, defendants believe that the burden on the minor parties is not imposed by the statute. Rather, the Commonwealth Court issues the management orders which require the candidates to validate the signatures on their nomination papers. These procedures are not dictated by the Election Code. Defendants also claim that it is private individuals, not state actors, who pursue court costs. To the contrary, it is the statute that makes this all possible. It is the statute which venues nomination paper objections in the judiciary, rather than the executive. It is the statute which allows private parties to challenge nomination papers. Aichele, 757 F.3d at 367 ("The Commonwealth cannot hide behind the behavior of third parties when its officials are responsible for administering the election code that empowers those third parties to have the pernicious influence alleged in the Complaint."). It is the statute which provides for cost shifting. In any event, the actions of the judiciary are no less the action of the state, NAACP v. Alabama, 357 U.S. 449, 463 (1958) ("It is not of moment that the State has here acted solely through its judicial branch, for whether legislative or judicial, it is still the application of state power which we are asked to scrutinize."), and there is compelling, although not undisputed, evidence that state employees have played a pivotal role in prosecuting objections. *See infra* note 23.

### 3) The state interest are outweighed by the burden imposed on plaintiffs' associational rights

Since plaintiffs have established that the Section 2911(b) in combination with Section 2937 impose a severe burden on their associational rights, the state must establish that the regulation is 'narrowly drawn to advance a state interest of compelling importance.'" Burdick, 504 U.S. at 434 (citing Norman, 502 U.S. at 289).

Defendants maintain that the Section 2937 deters candidates from submitting fraudulent and meritless petitions. It is well settled that Pennsylvania has a strong interest "to protect the integrity of its political processes from frivolous or fraudulent candidacies." Bullock, 405 U.S. at 145. (citing Jenness, 403 U.S. at 442).[37] According to the defendants, the financial burdens imposed by Section 2937 motivate candidates to "ensure their circulators are gathering valid signatures," and incentivizes candidates to strike invalid signatures from their nomination papers. Defs.' Mot. for Summary J., doc. no. 59, at 16. There can be little doubt that the costs associated with Section 2937 discourage the submission of fraudulent nomination papers and petitions. However, Section 2937 "is extraordinarily ill-fitted to that goal," because the statute has a tendency to exclude legitimate candidates as well. Bullock, 405 U.S. at 146.

In the defendants' view, the statute is narrowly tailored because "candidates who use due diligence in collecting signatures and file nomination papers that in objective

---

[37] I note a subtle distinction in defendants' argument. Defendants not only assert an interest in preventing frivolous from accessing the ballot. Instead, they wish to prevent frivolous candidates from filing nomination papers in the first place. I am not aware of any court decision to recognize so broad an interest. Rather, a state's signature validation process is adequate to weed out the frivolous from the non-frivolous candidates.

As a result, I cannot accept defendants' alternative argument that removing a candidate from the ballot is insufficient to deter the filing of frivolous nomination papers. To the contrary, removal from the ballot is more than adequate to protect the states compelling interest of avoiding ballot clutter and ensuring that only serious candidates appear on the ballot. By adding financial penalties to the mix, Pennsylvania chills prospective protected conduct which, for the reasons discussed in this memorandum, is impermissible.

good faith comply with the requirements of the Election Code" can avoid the costs associated by Section 2937. While this is true in the superficial sense, no amount of good faith will fend off a nomination paper challenge, and motions for costs are now a routine part of the process. In fact, the Court of Appeals, in its decision on the standing issue, acknowledged that recent history justifies the minor parties very real fear of objections and litigation costs. <u>Aichele.</u> 757 F.3d at 364; *See also* <u>Susan B. Anthony List</u>, 134 S.Ct. at 2345 ("past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" (citing <u>Steffel v. Thompson</u>, 415 U.S. 452, 459(1974)). As a result, Section 2937 imposes severe financial burdens on minor party candidates no matter how strong their support. Since no candidate can be expected to shoulder these extraordinary costs, Section 2937 undoubtedly excludes non-frivolous minor party candidates.

Finally, defendants maintain that the threat of sanctions deters meritless objections. There is absolutely no evidence supporting this conclusion. There is no real threat that a court would impose sanctions against an unsuccessful objector. No party has ever been fined for challenging the nomination papers of a minor party candidate for statewide office. In any event, the rate at which challenges are filed suggests that the threat of sanctions has no deterrent effect.

Defendants have failed to justify the financial burdens which Section 2937 and Section 2911 (b) impose on plaintiffs. The statutes are not narrowly tailored to advance Pennsylvania's compelling interest in keeping frivolous candidates off the general election ballot because the threat of sanctions undoubtedly excludes non-frivolous minor

party candidates. The statutes are unconstitutional as applied to plaintiffs.[38] Therefore, I will grant plaintiffs' motion for summary judgment as to Counts I and II.

### b) Count III – Section 2937 is facially valid.

While Counts I and II advance an as-applied challenge to Section 2911(b) and Section 2937, Count III is a facial attack on Section 2937 and calls for the complete invalidation of the statute. "A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case." United States v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010) (citing City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 770 n. 11 (1988)). Plaintiffs bear a very heavy burden to prove the statute is facially invalid. See United States v. Salerno, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). Plaintiffs allege that Section 2937 is facially invalid because it is vague and overbroad. See City of Chicago v. Morales, 527 U.S. 41, 52 (1999) (recognizing that laws can be attacked on their face under these two theories).

A law is impermissibly overbroad if a "'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 449 n.6 (2008) (citing New York v. Ferber, 458 U.S. 747, 769-771 (1982)). The overbreadth must be both real and substantial. Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973). The doctrine is premised on "a judicial prediction or assumption that the statute's very

---

[38] This conclusion is not to be construed as invalidating Section 2911(b)'s signature requirements which the Third Circuit has upheld. Rogers, 468 F.3d at 197 – 98.

existence may cause others not before the court to refrain from constitutionally protected speech or expression." Id. at 612. "It is clear, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." Members of City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 800 (1984). The overbreadth doctrine is "strong medicine" and must be employed with hesitation, and as a last resort. Los Angeles Police Dep't v. United Reporting Pub. Corp., 528 U.S. 32, 39, 120 S. Ct. 483, 489, 145 L. Ed. 2d 451 (1999) (citing Ferber, 458 U.S. at 769). The doctrine does not apply "where the parties fail to describe the instances of arguable overbreadth of the contested law." Washington State Grange, 552 U.S. at 449 n. 6.

    In considering the validity of Section 2937, I am mindful that this is an action for declaratory judgment. "[T]he Declaratory Judgment Act 'expands the scope of available remedies' and permits persons 'to seek a declaration of the constitutionality of the disputed government action.'" Deveraux v. City of Chicago, 14 F.3d 328, 330 (7th Cir. 1994) (citing Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 71 n. 15 (1978). However, granting declaratory relief in this context can contravene the rule of avoiding needless adjudication of constitutional questions. El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 494 (1st Cir. 1992) (citing Kelly v. Illinois Bell Tel. Co., 325 F.2d 148, 151 (7th Cir.1963)). "In this vein, … declaratory judgments concerning the constitutionality of government conduct will almost always be inappropriate when the constitutional issues are freighted with uncertainty and the underlying grievance can be remedied for the time being without gratuitous exploration

of uncharted constitutional terrain." Id. (citing Gross v. Fox, 496 F.2d 1153, 1154–55 (3d Cir.1974)). [39]

I begin by noting the statute has a plainly legitimate sweep. Pennsylvania may require candidates for public office to submit nomination petitions and papers containing a prescribed number of signatures. Rogers, 468 F.3d at 197. It follows that the Commonwealth may also establish a method to verify that the signatures on the nomination petitions and papers are valid. In re Farnese, 17 A.3d 357, 372 (2011) ("Indeed, the existence of specific filing requirements envisions that there will be challenges."). The fact that Pennsylvania, unlike any other state, has chosen to venue this process in the judiciary does not, in and of itself, raise constitutional concerns. The possibility that costs may be shifted at the discretion of the court is unsurprising within the context of modern American litigation.

Section 2937 applies to major party, minor party and independent candidates alike, but there is no evidence that Section 2937 is having any impact on the speech of the major parties or their candidates. Due to the number of signatures required, validating signatures on a nomination petition to run in a statewide primary does not appear onerous. Additionally, costs have never been assessed against a major party candidate for statewide office. The fact that Section 2937 does not burden the speech of the major parties is demonstrated by the highly competitive 2014 Democratic Primary for Governor in which four candidates competed for the nomination.

---

[39] My disposition of this motion would not change if plaintiffs had requested an injunction. "District courts granting injunctions … should craft remedies 'no broader than necessary to provide full relief to the aggrieved plaintiff.'" Belitskus, 343 F.3d at 649-50 (citing McLendon v. Continental Can Co., 908 F.2d at 1182 (3d Cir.1990).

Since Section 2937 does not restrict the speech of the major parties, the statute is not unconstitutional in a "substantial number of its applications." Washington State Grange, 552 U.S. at 449 n.6 (citing Ferber, 458 U.S. at 769-771). While it is certainly possible that the statute could be impermissibly applied to a major party candidate or an independent candidate not represented in this litigation, a mere possibility is not enough to find the statute overbroad. *See* City Council of City of Los Angeles, 466 U.S. at 800. "[W]hatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." Broadrick, 413 U.S. at 615-16; *see also* Belitskus, 343 F.3d at 648 n. 10 (a suit challenging filing fees for nomination petitions and papers "must, by definition, be brought as an as-applied challenge and decided on its facts.")

Furthermore, plaintiffs do not identify any circumstances in which the statute would be overbroad. *See* Washington State Grange, 552 U.S. at 449 n. 6. Instead, plaintiffs maintain they "have submitted evidence that Section 2937 is causing citizens to refrain from circulating, submitting and defending nomination petitions, and to abandon their efforts to associate for political purposes…." Pls. Mot. for Summary J., doc. no. 60, at 23. However, this evidence only pertains to plaintiffs and their supporters. A declaration that Section 2937 is unconstitutional as applied to plaintiffs should remedy the chilling effect that the law is having on the First Amendment rights of the plaintiffs and their supporters. At this time, no broader relief is necessary to redress the harm caused by the statute.

Finally, Section 2937 is not unconstitutionally vague. A statute is void for vagueness if it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or if it authorizes arbitrary enforcement. City of Chicago, 527 U.S. at 56, (citing Kolender v. Lawson, 461 U.S. 352, 357 (1983)). The statute must "clearly mark the boundary between permissible and impermissible speech." Buckley v. Valeo, 424 U.S. 1, 40-41 (1976). While "the general test for vagueness applies with particular force in review of laws dealing with speech," Hynes v. Mayor & Council of Borough of Oradell, 425 U.S. 610, 620 (1976), courts should show "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99 (1982) (citing Barenblatt v. United States, 360 U.S. 109, 137 (1959)); *see also* Buckley, 424 U.S. at 40-41 ("Close examination of the specificity of the statutory limitation is required where, as here, the legislation imposes criminal penalties in an area permeated by First Amendment interests."). I will read Section 2937 with the same construction given by the Pennsylvania Supreme Court. *See* City of Chicago, 527 U.S. at 61 (citing Smiley v. Kansas, 196 U.S. 447, 455 (1905)).

An award of costs pursuant to Section 2937 may be appropriate where "fraud, bad faith, or gross misconduct is proven, … [but] a party's conduct need not proceed to such an extreme before an award of costs may be dictated by justice." In re Farnese, 17 A.3d at 372. Plaintiffs aver that the In re Farnese Court's interpretation of the statute fails to

distinguish between prohibited and permissible conduct.[40] I disagree. Shifting costs during the course of litigation is commonly available in state and federal courts. *See* Fed. R. Civ. P. 54(d)(1); Pa. R. Civ. P. 1023.1. Where not authorized by rule or statute, a court may tax cost pursuant to its "inherent powers to control the conduct of those who appear before them," Hygienics Direct Co. v. Medline Indus., Inc., 33 F. App'x 621, 626 (3d Cir. 2002) (citing Chambers v. NASCO, Inc., 501 U.S. 32 (1991)), and is typically committed to the trial court's sound discretion. *See* In re Paoli R.R. Yard PCB Litig., 221 F.3d 449, 458 (3d Cir. 2000). By allowing the Commonwealth Court to determine when an award of costs is just, Section 2937 reflects this well-established American jurisprudence and can hardly be called vague.

Furthermore, the Farnese Court warned the Commonwealth Court not to award costs when it would chill First Amendment expression. 17 A.3d at 372 ("First, we note that the Election Code must 'be liberally construed to protect a candidate's right to run for office and the voters' right to elect the candidate of their choice.'" (citing In re Nomination Petition of Driscoll, 847 A.2d 44, 49 (2004)). Just as state courts are competent to adjudicate constitutional disputes, I am confident that the Commonwealth Court will be mindful of the First Amendment issues implicated by Section 2937, and will refrain from taxing costs in a manner which will chill protected political speech in Pennsylvania. Since Section 2937 is neither overbroad nor impermissibly vague, I will grant defendants' motion for summary judgment as to Count III.

---

[40] Plaintiffs do not claim that the provisions for nomination paper challenges are void for vagueness.

**IV      Conclusion**

For the foregoing reasons, I will grant plaintiffs' motion for summary judgment as to Counts I and II. I will grant defendants' motion for summary judgment as to Count III. The motions are otherwise denied.

An appropriate order follows.